Cite as 2020 Ark. App. 481

# ARKANSAS COURT OF APPEALS

DIVISION III

**No.** CV-20-223

| | |
|---|---|
| KATIANA COLE | **Opinion Delivered:** October 21, 2020 |
| APPELLANT | APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT [NO. 23JV-18-193] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE DAVID M. CLARK, JUDGE |
| APPELLEES | AFFIRMED |

## MEREDITH B. SWITZER, Judge

Katiana "Katie" Cole appeals the Faulkner County Circuit Court's termination of her parental rights to her sons, SC (DOB 2-3-14) and KC (DOB 10-6-15).[1] Katie does not challenge the grounds for termination of her parental rights but rather argues on appeal that it was not in her sons' best interest for her parental rights to be terminated.[2] We affirm the termination of her parental rights.

## I. *Facts*

On July 17, 2018, the Arkansas Department of Human Services (DHS) exercised a seventy-two-hour hold on both SC and KC after KC was observed with unexplained

---

[1]The parental rights of the boys' father, Rollie Cole, were also terminated in this order, but he is not a party to this appeal.

[2]Because Katie does not challenge the statutory grounds for termination of her parental rights, she abandons any challenge to those findings on appeal. *Davidson v. Arkansas Dep't of Human Servs.*, 2019 Ark. App. 402, 585 S.W.3d 738.

bruising in various stages of healing on the left side of his face, on both arms and legs, and on his bottom. Neither Katie nor Rollie had sought medical treatment for KC or called law enforcement regarding the injuries even though the cause of the injuries was unexplained. DHS had been previously involved with the family in March 2016 when both boys were removed due to an unexplained fracture of KC's arm when he was five months old. That case was closed when the boys were reunified with Katie in 2017. The circuit court granted an ex parte order of emergency custody for both children. The circuit court subsequently entered a probable-cause order continuing the boys in DHS custody; the parties stipulated that probable cause existed.

The boys were adjudicated dependent-neglected on August 21. In the adjudication order, the circuit court found that the boys were at substantial risk of serious harm as a result of physical abuse to KC, noting extensive patterned bruising from his face to his knees that was inconsistent with an accident or normal toddler play and a healing bite mark to KC's nipple. Katie and Rollie stipulated that DHS could prove dependency-neglect by a preponderance of the evidence, but neither admitted having caused KC's injuries.

A disposition hearing was held on September 6, 2018, and the circuit court found it in the boys' best interest to remain in DHS custody given the extent of KC's injuries that led to removal; the prior abuse of KC; the testimony from both Rollie and Katie that Katie had struck KC in the face, causing the bruises present on his face at the time of his removal from Katie's custody; and the domestic-violence issues that existed in the home between Rollie and Katie. The circuit court set the goal of the case as reunification with a concurrent plan of adoption.

Review hearings were held in December 2018 and March and May 2019. A permanency-planning hearing (PPH) was held in July 2019. In the orders from those hearings, the circuit court found Katie had complied with the case plan and court orders, but specifically in the PPH order, it noted that while Katie had made progress, KC's injuries had yet to be explained, and Katie still had not acknowledged KC should have been taken to the hospital or a doctor sooner. The goal of the case remained reunification with a concurrent goal of adoption.

A fifteen-month review hearing was held on October 8, 2019. In the order from that hearing, the circuit court determined that reunification was no longer appropriate for the children, noting that "[a]lthough both parents have complied with the Court orders and services, and have 'checked off the boxes' during the case, the Court cannot find the parents have remedied the factors that lead to the juvenile[s] coming into custody." The court further found that, with the exception of the bruises on KC's face that Katie had admitted to causing, there had been no explanation as to how the injuries occurred, and it could not find it was safe for the children to be returned to their parents' custody. The court was especially concerned because in the prior case involving KC's broken arm, when custody was returned to Katie, she made assurances that no further harm would come to the children; yet the children came back into DHS custody due to more physical injuries inflicted on KC. The circuit court found adoption should become the primary goal and ordered DHS to take the necessary steps to terminate parental rights.

DHS filed a petition to terminate both Katie's and Rollie's parental rights on October 28, 2019, alleging two grounds applicable to Katie—failure to remedy and aggravated

3

circumstances. A termination hearing was held on December 3. Prior to that hearing, Rollie's parents filed a petition for guardianship of SC and KC, and at the beginning of the termination hearing, the circuit court granted them permission to intervene. The circuit court granted the termination of Katie's parental rights on both bases alleged by DHS in its petition.

At the termination hearing, Tyffanny Bailey, the family service worker who responded the night DHS received the call about SC and KC, testified that other than the facial bruising that Katie admitted she had caused, no one admitted inflicting KC's injuries. Bailey described the bruises on KC's body as red, brown, and black, and she noted that KC had a bite mark on his nipple that was scabbed over. After MEMS arrived and determined KC did not need to go to the hospital, Bailey waited until the next morning to remove the children.

Dr. Karen Farst, a pediatrician at Arkansas Children's Hospital (ACH), testified she first saw KC when he was admitted to ACH in March 2016 after presenting with a fairly complicated fracture and dislocation of his left arm in the elbow area that ultimately required orthopedic repair; KC was just five months old at the time. She said it was a very unusual fracture in a baby, one she had never seen in an infant. She opined that KC could not have caused the injury to himself, and she did not believe, as Katie and Rollie claimed, that two-year-old SC was capable of causing that type of fracture, either intentionally or accidentally.

When Dr. Farst saw KC again in July 2018, she noted linear bruising on different surfaces of his body from the left side of his face, down his arms, thighs, lower back, and buttocks; the bite mark on his chest; and bruising of KC's gums, with two teeth indicating

4

signs of pressed dental trauma. Because the bruising was all over KC's body, Dr. Farst concluded that it would have taken multiple impacts in order to inflict the bruising. She testified that the bruises did not look red and swollen as if they were freshly inflicted, but she was unable to give a more definite time of injury. Dr. Farst was concerned that, with this being a second episode of KC's being abused, the accumulation of adverse childhood experiences (ACES)—such as physical abuse, being in the care of a substance abuser, and experiencing domestic abuse in the family—could adversely affect behavior, health, and mental health. She was further concerned that if the issue causing the abuse was not addressed, there was a risk for abuse again. She further believed that even though SC was not the child being physically abused, the fact he was in the home where the physical abuse was occurring also presented occasion for him to be affected by ACES.

Rollie testified that he and Katie were not married during the 2016 case, but they married soon after Katie regained custody of the boys. They were still married, although he claimed to want a divorce. Rollie did not initially believe Katie had caused either the 2016 or the 2018 injuries to KC, but he now questioned whether she could have inflicted the injuries because she had been violent with him on several occasions, including one time in 2018 when she was arrested for domestic battery. He first thought the babysitter, Katie's sister, had caused KC's injuries but now believed Katie had caused them because she had whipped KC on her lunch break on the day the injuries occurred. He denied having caused any of KC's injuries.

Katie testified that she believed SC had caused KC's 2016 arm injury, even though Dr. Farst said that was not possible. She acknowledged that she married Rollie the day after

5

the boys were returned to her custody in May 2017. She admitted that she could see why people would think she was "playing a scam" in the current case, but she asserted that she had "moved on" from Rollie. Katie said that when KC was injured the second time, her sister, Anna Goins, and Goins's boyfriend, Steven Peyton, were babysitting him. Katie had come to check on the boys in the middle of the day, and other than the bruise on KC's face, she claimed none of the marks later seen on KC were present at that time. She admitted she had "swatted" KC while she was there but denied causing any of KC's other injuries. She pointed her suspicions at Rollie as the abuser, claiming he had physically and mentally abused her in the past.

When asked about Rollie's parents' petition for guardianship, Katie stated she wanted her aunt to have custody of the boys if her parental rights were terminated. She admitted, though, that she had not followed up with her caseworker to have her aunt considered as a placement.

Sara Lewis, the boys' caseworker, recommended they be placed for adoption if parental rights were terminated, and she stated she had families expressing a desire to adopt the boys. She explained that her adoption recommendation was based on her concern that this was the second time KC had been taken into care for injuries that were either unexplained or did not match the explanation given. She was further concerned that Katie had slapped KC in the face, causing bruising, but those injuries were not reported nor was medical attention sought. Lewis testified she provided the same services offered in the first case, and although she acknowledged Rollie and Katie had made strides in counseling and

6

in working on their own issues, she was still concerned the boys would be unsafe and at risk of harm if sent home with either parent.

Lewis said Katie had named Hilda Brown, a great-aunt, as a relative with whom she would like the boys to be placed if her parental rights were terminated. Lewis called and left messages, but Brown had not returned her calls. She noted that Rollie's parents were denied as provisional foster parents but had also requested a guardianship. Lewis said she would rather have the boys with family.

In terminating both Katie's and Rollie's parental rights, the circuit court noted that it was obviously error to believe Katie gained enough skills in the 2016 case to ensure the children would not be abused again because KC had incurred unexplained injuries again. The court was concerned there was never a valid explanation as to how the injuries occurred. The circuit court believed Rollie and Katie were going to be together, and it would not allow the boys to be placed back in the same volatile environment from which they had been removed on two occasions. The circuit court, therefore, terminated parental rights.

## II. *Standard of Review*

Termination-of-parental-rights cases are reviewed de novo. *Gonzalez v. Arkansas Dep't of Human Servs.*, 2018 Ark. App. 425, 555 S.W.3d 915. Terminating parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the children. *Griffin v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 635. The first step requires proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood that the

7

children will be adopted and of the potential harm caused by returning custody to the parent. *Id.* Each step requires proof by clear and convincing evidence, which is the degree of proof that will produce in the finder of fact a firm conviction regarding the allegation sought to be established. *Id.* Our appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Rickman v. Arkansas Dep't of Human Servs.*, 2018 Ark. App. 261, 548 S.W.3d 861. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Gonzalez, supra.* We give due deference to the circuit court's superior position to observe the parties and assess the credibility of witnesses. *Bonner v. Arkansas Dep't of Human Servs.*, 2018 Ark. App. 142, 544 S.W.3d 90.

### III. *Argument*

Katie's only argument on appeal is that terminating her parental rights was not in her sons' best interest. A best-interest finding must be based on the circuit court's consideration of at least two factors: (1) the likelihood of adoption if parental rights are terminated and (2) the potential harm caused by continuing contact with the parent. *Baxter v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 508. It is the overall evidence—not proof of each factor—that must demonstrate that termination is in the child's best interest. *Id.*

In making her best-interest argument, Katie does not argue her boys are not adoptable. Instead, she focuses on the potential-harm prong of the best-interest analysis, asserting error in the circuit court's finding that the boys would be subjected to potential harm if they were returned to her custody. We disagree. A potential-harm analysis must

8

be conducted in broad terms, taking into consideration the harm to the children's health and safety that might occur from continued contact with the parent. *Barnes v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 525. There is no requirement the circuit court find that actual harm would result or identify the potential harm. *Id*. The same evidence supporting the statutory grounds for termination may also support the circuit court's best-interest finding under the potential-harm prong. *See Belt v. Arkansas Dep't of Human Servs.*, 2020 Ark. App. 315, 603 S.W.3d 203.

The boys were taken into DHS custody in 2016 due to an unexplained injury to KC's arm. They were returned to Katie's custody in 2017, and the case was closed. The boys were taken into DHS custody for a second time in July 2018 due to unexplained injuries and bruises on KC's body. Throughout the case, other than the bruise on KC's face, no one took responsibility for his injuries or explained how they had occurred. Katie's parental rights were terminated based on two statutory grounds—failure to remedy and aggravated circumstances—because Katie could not explain the cause of KC's injuries. While Katie convinced the circuit court in 2017 that she had improved her parenting skills to the point the boys could be returned to her custody, less than one year later they were back in DHS custody for more unexplained injuries to KC. In determining potential harm, the circuit court may consider past behavior as a predictor of likely potential harm should the child be returned to the parent's care and custody. *Scott v. Arkansas Dep't of Human Servs.*, 2018 Ark. App. 347, 552 S.W.3d 463.

Katie asserts she has done everything DHS has asked of her and has benefitted from the services DHS provided. However, even full compliance with the case plan is not

9

determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Id.* Katie was given a second opportunity in 2017 when she regained custody of the boys, but KC continued to suffer unexplained physical injuries after being returned to her custody. The circuit court stated at the termination hearing that it believed there was an extreme likelihood they would be back in court if the children were returned to one or both parents, and it was not willing to take that risk a second time. The fact that the boys were removed from Katie's custody a second time and for the same reason—unexplained physical abuse of KC—is convincing evidence there was a potential for harm. Katie essentially is asking this court to reweigh the evidence on appeal in her favor; it is well settled that this court will not reweigh evidence on appeal and defers instead to the circuit court's credibility determinations. *Tovias v. Arkansas Dep't of Human Servs.*, 2020 Ark. App. 147, 596 S.W.3d 66. The circuit court did not clearly err in finding there was a potential for harm if the boys were returned to Katie's custody and the environment from which they were removed.

Katie further argues that adoptability and potential harm are not the only two factors to be considered in making a best-interest determination. Indeed, this court has held that other factors to be considered in making a best-interest finding may include preserving a child's relationship with a grandparent; the cessation of child support from a parent; if less drastic measures, such as a no-contact order or supervised visitation, may be used; if continued parental contact would be beneficial to the children if or when they are living with a relative and not in an indeterminate state that is working against them; and whether

the children are living in continued uncertainty.  *Phillips v. Arkansas Dep't of Human Servs.*, 2019 Ark. App. 383, 585 S.W.3d 703.

Katie argues that the circuit court failed to consider alternatives for permanency less restrictive than termination, including the guardianship requested by the boys' paternal grandparents or the possible placement of the boys with her great-aunt, Hilda Brown.  She points to the fact that Sara Lewis testified she would rather place the boys with family.  DHS, citing *Bryant v. Arkansas Department of Human Services*, 2011 Ark. App. 390, 383 S.W.3d 901, contends this argument is not preserved for appellate review because Katie did not make this argument at the termination hearing and failed to bring up the record of the fifteen-month review hearing when the goal was changed from reunification to adoption. We agree with DHS that the argument is not preserved.  The *Bryant* court, citing *Velazquez v. Arkansas Department of Human Services*, 2011 Ark. App. 168, held that failure to bring up the record of the hearing when the goal was changed to termination of parental rights (fifteen-month review hearing in this case) precluded review on appeal because while the permanency-planning order (fifteen-month review order in our case) was designated in her notice of appeal, the transcript of that hearing was not in the record, and there was no indication in the transcript of the termination hearing that the issue was ever raised to the circuit court.  The *Bryant* court held that failure to raise a challenge or obtain a ruling below is fatal to the appellate court's consideration of an issue on appeal.  *Bryant*, 2011 Ark. App. 390, at 7, 383 S.W.3d at 905.  In the present case, although Katie stated that she would prefer the boys to be placed with her great-aunt or their paternal grandparents, she did not make the less restrictive relative-placement argument she now makes on appeal to the circuit

court at the termination hearing, and she failed to bring up the transcript of the fifteen-month review hearing in which the goal was changed solely to termination of parental rights and adoption. For this reason, we hold that Katie's argument on this issue is not preserved for our review.

Affirmed.

ABRAMSON and BROWN, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor children.