Cite as 2021 Ark. App. 398

# ARKANSAS COURT OF APPEALS

DIVISION I

**No.** CV-21-142

| | |
|---|---|
| ALEXANDRA COULTER; GREGORY MCCUIN, JR.; AND ARKANSAS DEPARTMENT OF HUMAN SERVICES<br><br>APPELLANTS<br><br>V.<br><br>MINOR CHILD<br>APPELLEE | **Opinion Delivered** October 20, 2021<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, ELEVENTH DIVISION<br>[NO. 60JV-19-597]<br><br>HONORABLE PATRICIA JAMES, JUDGE<br><br>AFFIRMED |

## RITA W. GRUBER, Judge

Appellants Alexandra Coulter (Coulter), Gregory McCuin (McCuin), and the Arkansas Department of Human Services (DHS) appeal from an order of the Pulaski County Circuit Court terminating Coulter's and McCuin's parental rights to GM (born December 2, 2015). In separate briefs, appellants argue that the court erred in not considering the guardianship petition filed by DHS prior to the attorney ad litem's petition to terminate parental rights and that the court's best-interest finding is clearly erroneous because it failed to consider or address a less-restrictive alternative to termination. McCuin also challenges the potential-harm finding within the court's best-interest determination. We affirm.

### I. *Facts and Procedural History*

On May 9, 2019, DHS filed a petition for emergency custody and dependency-neglect of three-year-old GM. The supporting affidavit of the family-service worker provided that on May 1, 2019, DHS exercised emergency custody of GM after receiving a

report of inadequate supervision, failure to protect, and environmental neglect regarding five-month-old MM and GM. Police had been called to the home, where MM was found unresponsive. MM could not be revived and was pronounced dead on the scene. Coulter reported that MM had been having breathing problems the night before but that she did not take her to the emergency room. Coulter woke up around 4:45 a.m. and found MM not breathing. The affidavit stated that GM was removed from the physical custody of Coulter, indicating that the living conditions were hazardous and immediately threatening to GM and that Coulter's substance abuse seriously affected her ability to supervise, care for, and protect GM, who is autistic. Gregory McCuin, Sr. (the grandfather), GM's paternal grandfather, was identified in the affidavit as a provisional placement.

An investigator with the Crimes Against Children Division of the Arkansas State Police also provided a supporting affidavit. It stated that the bedroom where the family slept had a queen-sized mattress on the floor, which had no sheets and was "filthy with old stains." There was a bouncy seat beside the mattress. Drugs and drug paraphernalia were found in the bedroom, which were sent to the crime lab for testing. The affidavit indicated that Coulter advised that she would test positive for Klonopin/Xanax (benzodiazepine) and Suboxone (buprenorphine). In addition to those drugs, Coulter tested positive for methamphetamine and amphetamines and admitted to snorting methamphetamine two days earlier. McCuin advised that he would test positive for marijuana, which he did. He denied knowing that Coulter used methamphetamine.

The investigator reported that McCuin denied living in the home full time but admitted he was there the previous night, explaining that he had recently moved out of the home and was living with his sister. The affidavit indicated that McCuin was on a ten-year

2

probation related to drug charges with two years remaining and that there had been a history of domestic violence between Coulter and McCuin. The investigator had serious concerns about the living conditions at the time of MM's death, the history of drug abuse by the parents, and their ability to adequately care for, supervise, and provide a safe and healthy environment for GM.

The court entered an order of emergency custody on May 9. A probable-cause order was entered on May 13, 2019, which stated that GM was removed from Coulter's custody. It further stated that McCuin, the "acknowledged father," was living in the home but did not have a paternity finding. The court found that probable cause existed at the time of the hold and continued such that GM would remain in the custody of DHS. The court placed GM in a relative placement with the grandfather and ordered a home evaluation. Both Coulter and McCuin were allowed supervised visitation at DHS. An attorney ad litem was appointed. The court ordered Coulter and McCuin to submit to random drug screens; to attend parenting classes; to have drug-and-alcohol assessments, counseling assessments, and psychological evaluations and follow the recommendations therein; to obtain and maintain stable housing, employment, and income; and to keep DHS informed of changes in addresses, telephone numbers, and employment. McCuin was also ordered to establish paternity.

A court appointed special advocate (CASA) was ordered on May 14, 2019. Following an adjudication hearing on June 17, 2019, GM was adjudicated dependent–neglected due to parental unfitness and environmental neglect, drug use by a parent, and drug exposure of the child. The court found that McCuin, the noncustodial parent, contributed to the neglect because he resided in the home that had "extreme environmental concerns," including

3

possible drugs in the home, and GM's exposure to, or ingestion of, methamphetamine. The goal of the case was set as reunification with mother, father, or other fit and willing relative. The order stated that "grandfather needs some assistance in child proofing the house and understanding parenting concerns for this child with specific needs; however, the Court believes that these things can be resolved and that the trauma of removing the child from a family placement would outweigh the concerns."

A review hearing took place on October 16, 2019. In the review order entered the same day, the court found:

> Mom and Dad are in compliance with the case plan. Dad has made progress, but Dad needs to have insight into his progress. Mom is doing better than Dad. Mom has made significant progress. Mom and Dad need to gain stability and relapses do not help stability. Parents have made progress, but have more work to do.

The court further found that the case plan was moving toward an appropriate permanency plan and continued the goal of reunification with the mother, father, or placement with a fit and willing relative. The parents were given unsupervised visitation at the DHS office for two hours, twice a week.

A permanency-planning hearing was conducted on April 15, 2020. In its April 16, 2020 order, the court found:

> Mother and Father have made great progress up to this point. They have made great strides, but they do have some work left to do. Mother has struggled from alcohol which is a rough addiction and will be a struggle. Mother should get good support in place for her sobriety. The parents are making very sufficient progress. The parents need to work on their legal issues.

The goal of the case remained unchanged. The court also found that DHS had made reasonable efforts to finalize a plan for permanency and had provided services, noting that the parents had made "substantial and measurable progress to warrant an additional 90 days."

The court ordered two-hour twice-weekly unsupervised visitation at the DHS office to be done by electronic means due to the COVID-19 pandemic.

On July 14, 2020, DHS filed a petition for appointment of a guardian asking the court to appoint the grandfather as guardian of GM and asserting that the guardianship was sought to provide a permanent placement for GM. On August 4, 2020, the attorney ad litem filed a petition for termination of Coulter's and McCuin's parental rights, which DHS did not join. The termination petition alleged the grounds of failure to remedy (Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2021)) and aggravated circumstances (Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(A)-(B)(i))* as to both parents and subsequent factors (Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a))* as to Coulter only.

A fifteen-month permanency-planning hearing was held on August 10, 2020. The August 20, 2020 order provided in part:

> COMPLIANCE: The Court continued the original Permanency Planning Hearing to allow additional time for the parents to make significant progress in their case in order to progress beyond supervised visitation with their child. The parents have not taken advantage of this additional time, as Mother continues to struggle with her alcohol addiction. Father's medical issues and marijuana addiction have hindered his progress as well. Therefore, the Court cannot return the child to the care or custody of either parent today as neither have made significant and measurable progress towards remedying the situation that brought this child into foster care. Further, an additional 90 days of services would not bring the parents any closer to remedying the situation. As the court cannot return the child to the parents, it must determine if there is a fit and willing relative that could take custody or guardianship of this child. The child's paternal grandfather is a willing relative, but the Court is unable to find that he is a fit custodian for the child. From his testimony, the grandfather does not appear to be managing his diabetes and he seemed at times during his testimony to be confused. Due to the young age of this child and his autism and the reasons stated above, the Court cannot find that the grandfather is a fit relative to care for this child long term. The Court hereby changes the goal from reunification and placement with a fit and willing relative to adoption.

The court found that DHS had made reasonable efforts to finalize a permanency plan for GM and changed the goal of the case to termination and adoption. The court directed DHS to obtain an affidavit of indigency from McCuin in order for counsel to be appointed to represent him at the termination hearing. The court also set a termination of parental rights (TPR) status-report hearing for attorneys only on October 5, 2020. The October 6, 2020 TPR status-report order indicates that the parties did not present any reason why the termination hearing could not go forward. Counsel was appointed for McCuin pending receipt of his affidavit of indigency. On October 12, 2020, Coulter's counsel requested a continuation of the termination hearing due to an unexpected surgery, and the court continued the case to November 30, 2020.

The termination hearing took place on November 30, 2020. The court heard testimony from the parents, Elizabeth Oldridge (adoption specialist), Teresa Siegel (CASA), and Teresa Bunche (DHS caseworker). The court took the case under advisement and entered an order terminating parental rights on December 31. The court found by clear and convincing evidence that the ad litem had proved the grounds of failure to remedy and aggravated circumstances as to both parents and subsequent factors as to Coulter. The court further found by clear and convincing evidence that it was in GM's best interest to terminate the parental rights of both Coulter and McCuin, considering both adoptability and potential harm.

Key findings from the court's termination order included that Coulter is not capable of safely caring for GM. Although she had completed most of the court-ordered services, Coulter suffered several relapses with her use of alcohol and made poor decisions. Coulter picked up new criminal charges related to her alcohol abuse as well as continuing issues in

6

her relationship with McCuin. The court found that Coulter had not accepted how her continued misuse of alcohol and numerous arrests had contributed to her inability to be reunited with GM.

Coulter testified that she had been arrested three times since the case opened, which included arrests for theft by receiving in 2019; DWI and refusal to submit in January 2020; and public intoxication in April 2020, a few days after the April 2020 permanency-planning hearing. She was charged with public intoxication after she was found intoxicated, walking on University Avenue in Little Rock. Coulter testified that she was admitted to UAMS at that time because she drank too much and had to be intubated. Her blood-alcohol content was .31.

Siegel, who had been appointed as the CASA volunteer in May 2019, testified she has many concerns with this family, including Coulter's alcohol abuse and the parents' unstable relationship. Siegel testified that Coulter is not honest about her struggle with her sobriety until she is caught. She further testified that the parents are not healthy and sober enough to care for GM's special needs and that their issues preclude them from being good advocates for his autism disability.[1]

Bunche, who became the assigned caseworker on July 27, 2020, testified that, although the parents have struggled with sobriety and stability for a portion of the case, she

---

[1]Siegel testified that GM is unable to communicate effectively because of his severe language deficiency. At the time of the termination hearing, GM was a few days shy of his fifth birthday. Siegel stated that GM communicated on the level of a two- to two-and-a-half-year-old toddler. Due to his language deficiency, Siegel had concerns that GM would be unable to call for help if needed. Siegel assisted in placing GM in the autism waiver program, which began in September 2020. This is a two-year program that involves in-home therapy services of twenty hours a week and requires caregiver involvement. She stated that if the caregiver is not involved, GM can be removed from the program.

did not believe termination of parental rights is in GM's best interest because she believed GM was in a stable placement with a family member who could become a permanent placement.

The court concluded that there is little likelihood that services to Coulter would result in successful reunification and that there was no compelling reason to allow her additional time to work toward reunification when she had "well over a year, and all prior services have, to this point, proven absolutely futile." The court found that Coulter is not a fit and proper parent and had no confidence that she could safely provide for GM and his challenging special needs. The court further found that (1) GM needs a stable, safe, drug-free environment with a sober parent who will ensure he receives appropriate care and supervision as he grows; (2) Coulter is not in a position to do so now or any time in the reasonable future when viewed from GM's perspective; and (3) Coulter had not remedied the issues that caused GM to be taken into care. The court found that establishing a goal of placement with Coulter—or continuing contact between Coulter and GM—would result in harm to GM.

McCuin was referred for the standard court-ordered services, including random drug screens; drug-and-alcohol assessment; counseling assessment with recommendations to be followed; psychological evaluation with recommendations to be followed; and parenting classes. He was also ordered to establish paternity and to maintain housing, employment, and income. McCuin testified at the termination hearing that he had completed his drug-and-alcohol assessment, psychological evaluation, and parenting classes, and he was currently participating in counseling. He had also taken random drug screens. He testified he was not living at the home with Coulter when GM was taken into DHS custody and had never

observed drugs in the home. McCuin acknowledged that he has taken pain pills since his car accident in 20l9, and the severe pain prevents him from keeping a job. He testified on the day of the hearing that if he were given custody of GM that day, he would not be able to provide him food, shelter, or other necessities. At the time of the termination hearing, McCuin had prescriptions for oxycodone, gabapentin, and cyclobenzaprine, which he stated he took only when he was in severe pain. McCuin did not believe his pain and medication would affect his ability to parent GM. He did not think he had an active warrant but admitted he had a court date on January 5, 2021. He acknowledged he was not employed, was seeking disability payments, and was not current on his child-support obligations. McCuin testified that, although he currently lived with Coulter, he could live with his mother, his sister, or friends.

Siegel testified that she has concerns with McCuin's ongoing issues with pain that make him unable to have or limited his interaction with GM; his continued use of pain medication; his heavy reliance on Coulter and other individuals for his income; the denial of Social Security disability benefits twice; his failure to seek employment; and his anger and relationship issues with Coulter. Bunche testified that DHS's concern with McCuin was his continued association with Coulter and that GM could not be safely returned that day because McCuin still lives with her.

With respect to McCuin, the court found that the case had been open for more than a year; McCuin had not remedied the initial cause of removal; and giving McCuin additional time would require GM to "needlessly languish in limbo." The court found no compelling reason to grant McCuin additional time for services or attempts at compliance. The court also found that McCuin is not a fit and proper parent and had no confidence that he could

9

consistently and safely provide for GM and GM's needs. The court found there was little evidence that McCuin could provide the safe and stable environment that GM desperately needs. The court further found that GM's health and safety would be at risk if custody were ever placed with McCuin.

Each of the appellants filed a timely notice of appeal from the December 31, 2020 termination order.

## II. *Standard of Review*

We review termination-of-parental-rights cases de novo. *Chandler-Sivage v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 544, 532 S.W.3d 113. Our inquiry is whether the circuit court's findings that the disputed facts were proved by clear and convincing evidence are clearly erroneous. *Id*. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id*. The reviewing court defers to the circuit court because of its superior opportunity to observe the parties and to judge the credibility of witnesses. *Id*.

In order to terminate parental rights, the circuit court must find by clear and convincing evidence that one or more statutory grounds for termination exists. *Belt v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 315, 603 S.W.3d 203. A circuit court must also find by clear and convincing evidence that termination is in the best interest of the child, taking into consideration (1) the likelihood that the child will be adopted if the termination petition is granted; and (2) the potential harm of returning the child to the custody of the parent, specifically addressing the effect on the health and safety of the child. *Id*.

We first address the argument that the court erred in not considering the guardianship petition. DHS acknowledges that no party appealed the August 10, 2020 permanency-planning order wherein the court changed the goal of the case from reunification with a parent or relative placement to termination and adoption upon finding that the grandfather was not fit as a long-term placement for GM. Recognizing that the failure to designate a permanency-planning order in the notice of appeal is normally a bar to our review of the court's decision to change the goal of the case, DHS asserts that it is not challenging the goal change pursuant to Ark. Code Ann. § 28-65-210 (Repl. 2012) but is challenging the "improvident dismissal" of its guardianship petition. Although DHS suggests that the court dismissed its guardianship petition, the record does not establish a dismissal of the petition.

DHS indicated at the outset of the termination hearing that it "thought" the court would consider both the guardianship and termination petitions at the hearing and had subpoenaed witnesses. When the attorney ad litem responded that she had no notice that the guardianship petition would be heard that day and was not prepared, counsel for Coulter disagreed, indicating that there had been correspondence between the parties. The court stated that the docket indicated the case was set for TPR and that it did not have time to hear the guardianship petition that day. And further, the court noted that, in light of the grandfather's testimony at the PPH hearing, the court was unable to find he was a fit long-term custodian for GM, changed the goal from reunification or placement with a fit and willing relative to termination and adoption, and set the matter for a TPR hearing.

When DHS asked the court whether it was saying that it was not going to allow the guardianship petition to be heard, the court stated not "today" because "today is a hearing

set for termination of parental rights." There is nothing in the record to indicate that the court dismissed the petition for guardianship; rather, it simply refused to hear it at the termination hearing. Moreover, there is no indication in the record that DHS requested a hearing on its petition prior to the termination hearing. Neither the fifteen-month permanency-planning order nor the TPR status order mentioned the guardianship petition. Although there was argument of counsel mentioning correspondence about whether the guardianship petition would be heard, nothing was proffered to show that the parties and the court contemplated hearing the guardianship petition at the termination hearing. Here, there is nothing in the record to demonstrate that the circuit court ruled on the guardianship petition. Therefore, there is nothing for this court to review. *Taffner v. Ark. Dep't of Hum. Servs.*, 2016 Ark. 231, 493 S.W.3d 319.

DHS alternatively argues that the permanency-planning statute specifically provides that Ark. Code Ann. § 9-27-338(b)(1)(B) (Repl. 2020) does not prevent DHS or the attorney ad litem from filing a petition for guardianship at any time prior to the permanency-planning hearing. As such, DHS argues that the statute implies that it was entitled to have its petition, filed before the PPH hearing, heard separate and apart from any consideration of the permanency goals set out in Ark. Code Ann. § 9-27-338. DHS contends that at a minimum, because it filed the guardianship petition before the goal was changed, the court should have allowed DHS to present its evidence in support of its petition and make a ruling within the context of the guardianship statutes to either dismiss or grant DHS's petition. DHS contends that the court "effectively foreclosed" it from presenting any evidence as to the grandfather's fitness as a guardian under the premise that it had already decided in its permanency-planning order that the grandfather was not "fit" for a long-term placement,

12

which it suggests is in contravention of the plain language of the statute. There is no indication, however, that DHS made these arguments below or that the court made a ruling. Even in termination cases, we will not address arguments raised for the first time on appeal. *Sills v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 9, at 14, 538 S.W.3d 249, 258.

Inasmuch as appellants argue that they were foreclosed from introducing evidence as to the grandfather's fitness, appellants failed to proffer the relevant testimony to which they claim they were foreclosed from introducing. We note that appellants made no argument at the termination hearing that the grandfather's situation had somehow changed since the court's finding at the permanency-planning hearing that he was not a fit long-term placement for GM. Because we will not presume that a circuit court erred, it is an essential requirement that appellants must produce a record showing reversible error. *New v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 604, at 3 (citing *Johnson v. State*, 342 Ark. 357, 28 S.W.3d 286 (2000)).

III. *Best-Interest Argument—Less-Restrictive Alternative to Termination of Parental Rights*

Although phrased slightly differently, each of the appellants argues that the court's best-interest determination is clearly erroneous because a less-restrictive alternative to termination existed, which the court failed to consider. Their arguments focus on the court's failure to consider the grandfather as a permanent-relative placement or guardian. Appellee contends that appellants' failure to appeal the permanency-planning order and designate the transcript of the permanency-planning hearing precludes our review of this issue. We agree.

Appellants' least-restrictive-alternative arguments essentially challenge the court's permanency-planning decision changing the goal of the case from reunification or placement with a fit and willing relative to adoption. Appellants failed in their notices of

appeal, however, to indicate that they were appealing this intermediate order and did not designate the transcript of the permanency-planning hearing wherein the court heard the testimony of the grandfather and found that, although willing, he was not a fit relative for long-term placement.

Rule 6-9 of the Rules of the Arkansas Supreme Court specifically addresses appeals in dependency-neglect cases. Our cases have held that in order to challenge findings made in the permanency-planning order, the order must be designated in the notice of appeal, and the record must include the transcript of the hearing. For example, in *Velazquez v. Arkansas Department of Human Services*, 2011 Ark. App. 168, we held that the appellant's arguments challenging termination of parental rights actually related to the earlier permanency-planning hearing. The appellant's notice of appeal failed to designate the permanency-planning order and bring up the record of the permanency-planning hearing. "While a termination order might bring up all intermediate orders, appellant did not designate the permanency-planning hearing in his notice of appeal, effectively waiv[ing]" his arguments related to the permanency-planning order. *Velazquez,* 2011 Ark. App. 168, at 5. Similarly, in *Bryant v. Arkansas Department of Human Services*, 2011 Ark. App. 390, at 7, 383 S.W.3d 901, 905, we held that "Bryant failed to designate the permanency-planning hearing in her notice of appeal. Although she designated the permanency-planning order in her notice of appeal, the transcript of that hearing is not in the record." *See also Thomas v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 457, at 5, 610 S.W.3d 688, 692 (stating that while a termination order might bring up all intermediate orders, including an unappealed permanency-planning order, the intermediate order must be designated in the notice of appeal); *Cole v. Ark. Dep't of Hum. Servs.,* 2020 Ark. App. 481, 611 S.W.3d 218 (appellant's

argument that the circuit court failed to consider alternatives for permanency less restrictive than termination was not preserved because appellant failed to raise it at the termination hearing and to bring up the transcript of the review hearing where the goal was changed).[2]

Although no reply briefs were filed in this case, McCuin and DHS addressed the preservation issue in their initial briefs. DHS recognizes *Velasquez*, *supra*, and admits that it did not appeal the permanency-planning order but again asserts that it is not challenging the permanency-planning order but argues the court's failure to consider the guardianship petition filed prior to the goal change. McCuin argues that an appeal of the permanency-planning order was not required to preserve the argument, citing *Clark*, *supra*, and *Henson v. Arkansas Department of Human Services*, 2014 Ark. App. 225, 434 S.W.3d 371. Both cases are distinguishable.

We noted that the permanency-planning order in *Clark* was not a final, appealable custody order under Rule 6-9 but was one that would require a certification pursuant to Ark. R. Civ. P. 54(b). We explained:

> The clear implication is that a permanency-planning order of the typical variety is an interlocutory order that *does not have to* be appealed when it issues. If it *had to* be appealed when issued, then there would be no need to invoke Rule 54(b). Moreover, in the permanency-planning order before us, the circuit court itself wrote, "The goal established in the case was reunification. The concurrent goal was custody and adoption." Consequently, there was no pressing need for Clark to appeal the interlocutory permanency-planning order because, at the time, a concrete plan (and some hope) was in place to reunite Clark with the children. In other words, there were two permanency paths going into the termination hearing, and one path on the table was a preferred option from Clark's point of view. Adoption by the foster parents did not become the clear choice until the termination hearing was convened. During the hearing, DHS recommended that the children be placed with Clark's

---

[2]McCuin argues that *Cole*, *supra*, is in conflict with *Best v. Arkansas Department of Human Services*, 2020 Ark. App. 485, 611 S.W.3d 690, and *Borah v. Arkansas Department of Human Services*, 2020 Ark. App. 491, 612 S.W.3d 749. Our decisions in *Best* and *Borah* are silent on whether the appellants preserved their relative-placement arguments.

parents in Indiana. That is what Clark herself wanted if the children were not going to be returned to her. There was therefore no technical or practical legal reason to have pursued an appeal before Clark's preferred permanency-placement option was foreclosed by a judicial determination. We therefore conclude that Clark is not procedurally barred from arguing that termination was not in the children's best interest because an alternative and satisfactory relative placement was available for the circuit court to consider when it ordered the termination. *See Ellis v. Ark. Dep't of Human Servs.*, 2016 Ark. 441, 505 S.W.3d 678.[3]

*Clark*, 2019 Ark. App. 223, at 4–5, 575 S.W.3d 578, 580–81. Unlike the facts in *Clark*, here, reunification or placement with the grandfather was no longer a goal at the time of the termination hearing.

In *Henson*, DHS argued that the parents were procedurally barred from challenging the court's finding that they subjected their children to aggravated circumstances where it was originally made in a no-reunification-of-services order that could have been appealed. We disagreed, noting that there was no language in the order "comporting with Rule 6-9(a)(1)(B)'s requirement that the court include the equivalent of a Rule 54(b) certificate." 2014 Ark. App. 225, at 5, 434 S.W.3d at 374. After the termination hearing, the circuit court also found that DHS had proved aggravated circumstances. Thus, it was an issue before the court at the termination hearing.

Based on the facts of this case, we agree with appellee that the appellants' best-interest argument regarding a less-restrictive alternative is procedurally barred.

---

[3]McCuin asserts that *Ellis* made it clear that a parent is not procedurally barred from challenging relative placement even where the parent failed to appeal a prior order changing the goal of the case to adoption. That case, however, involved an appeal of the permanency-planning order in which the circuit court denied a motion to consider the home study of a relative.

## IV. *McCuin's Potential-Harm Argument*

When deciding best interest, the circuit court must look at all the circumstances, including the potential harm of returning the children to their parents' custody, specifically the effect on the children's health and safety, and it must consider the likelihood that the children will be adopted. Ark. Code Ann. § 9-27-341(b)(3). In considering the potential-harm factor, the circuit court is not required to find that actual harm would result or to identify specific potential harm. *Gonzalez v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 425, at 12, 555 S.W.3d 915, 921. Potential harm must be viewed in a forward-looking manner and in broad terms, including the harm the child suffers from the lack of a stable permanent home. *Id.* Additionally, a parent's failure to comply with court orders is sufficient evidence of potential harm, as well as persistent lack of stability with housing and income. *Id.* at 11–12, 555 S.W.3d at 921–22.

McCuin argues that the evidence failed to demonstrate he posed a risk of harm to GM. He states that he completed all the services except couples counseling, which could not be completed due to the COVID-19 pandemic, and made progress throughout the case. He acknowledges, however, that he was still working to obtain disability income as a result of injuries he sustained in a car accident. He contends that it was not until he was appointed counsel that he received guidance that he needed to separate from Coulter, which he was willing to do. He states that he has relatives who are willing to support him in establishing a home separate from Coulter. He also contends that it was pure speculation that his prescription medications impeded reunification. He states that if he could have an additional ninety days "either DHS could have a hearing on its pending guardianship petition . . . or he could remedy his outstanding issue" of establishing a home separate from Coulter.

Here, the court found that the case had been open for over a year; that GM had been in DHS custody since his removal; that McCuin had not remedied the initial cause of removal; that giving McCuin additional time would merely require GM to "needlessly languish in limbo"; and that it found no compelling reason to give McCuin more time for services or attempts at compliance. The court found that McCuin was not a fit and proper parent and had no confidence that he could consistently and safely provide for GM and his needs. The court stated that there was little evidence that McCuin could provide the safe and stable environment that GM needs. The court found that establishing a goal of permanency with McCuin or continuing contact between him and GM would result in a risk of potential harm and that GM's health and safety would be at risk if he were placed in McCuin's custody.

We have held that a court may consider past behavior as a predictor of potential harm should the child be returned to the parent's care and custody. *See Furnish v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 511, at 14, 529 S.W.3d 684, 692. We have also held that a parent's failure to comply with court orders itself is sufficient evidence of potential harm. *See Bell v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 446, at 12, 503 S.W.3d 112, 119.

Both of these considerations were present in this case. Despite having been ordered to obtain stable housing and income from the outset of the case, McCuin failed to do so. McCuin testified that he lived with Coulter but could live with his sister, his mother, or friends if he was unable to live with Coulter. He also testified that he has pain from his 2019 car accident that prevented him from keeping a job, but he was seeking disability. The CASA volunteer testified that McCuin had been denied disability benefits twice and had

not sought employment. Based on the facts in this case, we cannot say the potential-harm finding is clearly erroneous.

Affirmed.

VAUGHT, J., agrees.

WHITEAKER, J., concurs.

**PHILLIP T. WHITEAKER, Judge, concurring**. I agree with the majority that the termination decision in this case should be affirmed. I write separately to make it clear that I believe the fatal flaw in this appeal to be appellants' failure to bring up an adequate record for us to review.

Rule 2(b) of the Arkansas Rules of Appellate Procedure–Civil states in relevant part that "[a]n appeal from any final order also brings up for review any intermediate order involving the merits and necessarily affecting the judgment." Here, the court entered an order following the fifteen-month permanency-planning hearing addressing the least restrictive alternative; the fitness of the grandfather as a proper placement; and the goal of the case. Thus, the fifteen-month permanency-planning order is an intermediate order involving the merits and necessarily affecting the judgment, and the appellants' appeal of the termination order brings up for review the court's decision from that order.

We, however, cannot address the merit-based arguments from the fifteen-month permanency-planning hearing because the parties failed to designate the relevant portions of the record related to that hearing. In fact, the parties designated only the transcript of the November 30, 2020 termination hearing. Because the appellants' challenge is, in essence, a challenge to the court's permanency-planning determination changing the goal of the case from reunification or relative placement to termination and—probably more importantly—

19

its express and specific determination that the grandfather was not a fit permanent-placement option, the issue is not properly preserved for our review.

*James & Streit*, by: *Johathan R. Streit*, for separate appellant Alexandra Coulter.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for separate appellant Gregory McCuin, Jr.

*Andrew Firth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.