Cite as 2024 Ark. App. 444

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. CV-24-291

| | | |
|---|---|---|
| CASSANDRA NELSON | | Opinion Delivered September 25, 2024 |
| | APPELLANT | |
| | | APPEAL FROM THE UNION COUNTY CIRCUIT COURT |
| V. | | [NO. 70JV-23-50] |
| | | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | | HONORABLE RYAN PHILLIPS, JUDGE |
| | APPELLEES | AFFIRMED |

**ROBERT J. GLADWIN, Judge**

Cassandra Nelson appeals the February 15, 2024 order of the Union County Circuit Court terminating her parental rights to her children, MC1 and MC2. Cassandra argues that circuit court erred in terminating her parental rights because it was not in the children's best interest and was contrary to the purpose of the Juvenile Code. We affirm.

I. *Facts and Procedural History*

On May 6, 2023, MC2 was born at Cassandra's home. Cassandra and MC2 were brought to the hospital around 11:50 p.m. that day where staff noticed that Cassandra appeared to be impaired. She tested positive for methamphetamine and fentanyl. Cassandra was too impaired to answer any questions or function properly, and MC2 was reported to be withdrawing as a result of Cassandra's drug use, although no test results were received from MC2 at that time.

On May 18, the Arkansas Department of Human Services ("DHS") exercised a seventy-two-hour emergency custody hold of MC2 due to Garrett's Law[1] and because Cassandra had not been to see MC2 in the NICU and had failed to meet MC2's need for medical coverage by failing to apply for Medicaid.

DHS had closed a ten-month protective-services case in February after Cassandra had tested positive for THC and buprenorphine after the birth of MC1, MC2's half sibling, on April 24, 2022. Cassandra was provided with drug treatment as part of that case, but she failed to remain sober.

On May 22, the circuit court was presented with a petition for ex parte emergency custody and dependency-neglect. DHS submitted that Cassandra's substance abuse seriously impairs her ability to supervise, protect, or care for MC2. It was noted that Cassandra's history with DHS indicated previous Garrett's Law issues within the last twelve months and that there had been no change in behavior to complete sobriety.

Additionally, DHS filed for less-than-custody protection for MC1. MC1 was residing with Jackie Nelson, her maternal grandmother, at the time of MC2's birth. MC1 had been in Jackie's care since birth, and although DHS did not take physical custody of MC1, she was added as a party because DHS had an investigative history with Cassandra at the time of

---

[1]Arkansas Code Annotated section 9-27-303(37)(B)(i) (Supp. 2023), also known as Garrett's Law, was passed in 2005 to expand the definition of child neglect. The law makes it a form of child neglect for a pregnant person to knowingly use illegal substances before giving birth and also allows medical professionals to report mothers to police and child protective services if a newborn tests positive for illegal drugs.

MC1's birth and because Cassandra had been in the same home, and DHS believed that MC1 needed to be protected from Cassandra. Jackie asked Cassandra to move out of the home so that MC1's placement would not be disrupted, and Cassandra complied.

On May 23, the circuit court entered an ex parte order for emergency custody. The circuit court also held a probable-cause hearing on the same day, and on June 15, the circuit court entered a probable-cause order finding that probable cause existed to necessitate protection by DHS and that probable cause continued to exist at the time of the hearing for the emergency order to remain in place, including the protections for MC2 and keeping MC2 in the custody of DHS. Additionally, it confirmed that Cassandra could not reside in the home with MC1, who was staying with her maternal grandmother. The order provided for supervised visitation and development of a case plan.

An adjudication hearing followed on June 5, after which the circuit court entered an order on June 23 finding both children dependent-neglected pursuant to Garrett's Law. The order provided that the case plan goal be reunification. MC2 was to remain in the custody of DHS, and MC1 was to remain with Jackie. Cassandra was ordered to follow the case plan and court orders—to obtain and maintain stable, clean, adequate, and suitable housing with working utilities; to obtain and maintain stable employment or sufficient income; to complete parenting classes; to submit to random drug screens and test negative; to complete a substance-abuse assessment and follow the recommendations; to undergo a psychological evaluation; and to attend and participate in individual counseling. Her visitation was to remain supervised. The adjudication order was not appealed.

3

On September 18, 2023, the circuit court held a review hearing and entered a separate order for Cassandra to submit to a hair-follicle drug screen. At the review hearing, the circuit court ordered that the case plan goal remain reunification and that MC2 remain in the custody of DHS and MC1 to remain with Jackie. The court also found that Cassandra had not complied with the case plan and had not demonstrated progress.

Due to Cassandra's lack of compliance, DHS expedited the termination of her parental rights ("TPR"), alleging in two separate petitions—the first filed on September 20, and the second on December 13—aggravated circumstances pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)*(a)(3)(A)* & *(B)(i)* (Supp. 2023) and subsequent factors pursuant to section 9-27-341(b)(3)(B)(vii)*(a)* as grounds. The second TPR petition also alleged that Cassandra had abandoned the children pursuant to section 9-27-341(b)(3)(B)(iv). DHS asserted that adoption was the appropriate permanency plan for MC1 and MC2.

On December 18, the circuit court held another review hearing in which it continued the goal of reunification. At this hearing, the circuit court ordered that MC1 remain with Jackie and MC2 remain in the custody of DHS. Additionally, the circuit court found that genetic-testing results revealed that there was a zero percent chance that Jordan Keaster is MC2's father. The circuit court also found that Cassandra had not complied with the case plan and orders of the court and had not demonstrated progress toward the goal of the case.

On February 5, 2024, the circuit court held a hearing on the TPR petition. The caseworker, Iesha Howard, reiterated what the various orders demonstrated—that Cassandra had not complied with the case plan services, that she continued to use drugs, and that she

was too unstable to parent. Howard believed that Cassandra did not have a bond with the children. The adoption specialist, Parisse Watson, testified that both children are likely to be adopted as a permanency plan—with 197 potential matching families, and she identified Jackie Nelson as an adoptive resource for MC1 and Dana Keaster as an adoptive resource for MC2.

Cassandra testified in her defense and confirmed that she was living with a friend, lacked the means to support herself, was without a vehicle and employment, and had not completed services intended to assist her in becoming drug-free and stable. She acknowledged that she had not yet bonded with MC2, but she disagreed that she was not bonded with MC1, given that she had lived with MC1 in her mother's home and had continued to visit MC1 there during the pendency of the case.

At the end of her testimony, Cassandra read a letter she had prepared, admitting her failures, acknowledging that she had been lying to everyone and herself about not needing help, and asking for time, even though she understood the evidence against her. She expressed concern about her children feeling abandoned and suffering from self-esteem issues due to her absence, and she asked for the full time allotted under the statute so she could enter treatment for herself and for her children. She noted that she—on her own—had scheduled an appointment at New Horizons for the following day.

In closing, DHS's counsel acknowledged that the case had been open for only nine of the usual twelve months, but he did not believe the additional three months would change the outcome of the case. Cassandra's counsel countered that "a lot can happen in three

months," that Cassandra had openly acknowledged her failures, and an extension would not be an additional three months but rather would round out the twelve-month time period that is normally provided in the standard course of dependency-neglect cases. He noted that nothing would change from the children's perspective because there would be no "harm" in allowing Cassandra to demonstrate what she had orally expressed.

The circuit court found Cassandra neither credible nor trustworthy, that she had chosen to "do nothing at all in this case," and that it had no confidence that she would do anything over the course of three more months to warrant reunification, specifically stating:

> It is clear from a credibility standpoint quite simply that [Cassandra] has none. In this matter, there was nothing rebutting many of the claims as far as her testimony that were totally inconsistent. The other thing the Court's gotta look at is quite frankly if I gave her more time, I don't know how I can evaluate that. The uncontradicted testimony is that she falsified urine tests. So, I can't even trust monitoring whatever she may do between now and three months from now.

> She has certainly had the opportunity to have much more contact with the minor children. She has not shown any inclination to do that.

> She comes in talking about deficiencies in her mental health, yet, she has done nothing to try to address that, despite that fact it was ordered by the Court. Same on the drug treatment. Today, she decides she needs the treatment again. She's had the opportunity to do that in the past.

> Essentially, she has chosen to do nothing at all in this case and based upon that the Court has no confidence at all that she will do anything that would warrant reunification in this case or firmly believes if the children were to go back in her custody, their safety and welfare would be in imminent jeopardy should they be placed back into her custody.

The circuit court noted, "Based on Ms. Watson's testimony, the chances of these two being adopted are relatively high, given the circumstances, that is favorable." The circuit

6

court memorialized its findings in an order filed on February 15, finding the single ground—aggravated circumstances based on little likelihood of reunification even with services—in support of TPR. The circuit court further found that TPR was in the children's best interest because they would be subject to potential harm if returned to Cassandra's custody and that they were likely to be individually adopted as a permanency plan. Cassandra filed her timely notice of appeal on February 27.

## II. *Standard of Review and Applicable Law*

Termination-of-parental-rights cases are reviewed de novo. *Chevallier v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 373, at 8. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*

To terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the child, taking into consideration (1) the likelihood the child will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. *Id.* at 9; *see* Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing by clear and convincing evidence as to one or more of the grounds for termination listed in

7

section 9-27-341(b)(3)(B). However, only one ground must be proved to support termination. *Chevallier*, 2024 Ark. App. 373, at 9.

Because Cassandra does not challenge the circuit court's findings regarding either statutory ground, we need not consider those issues. *See Houston v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 326, at 7, 652 S.W.3d 188, 192. However, unchallenged statutory findings can "inform" the appellate court on the best-interest issues. *Cancel v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 198, at 9.

### III. *Discussion*

Although Cassandra does not challenge the circuit court's aggravated-circumstances finding, she does challenge the best-interest finding, which must be made separate and apart from any statutory grounds that might exist and for which DHS continues to carry the burden of proof. *See* Ark. Code Ann. § 9-27-341(b)(3)(A) & (B). This court has reversed the termination of parental rights solely on errors made by a circuit court in its best-interest findings. *See Bunch v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 374, at 9–10, 523 S.W.3d 913, 919; *Cranford v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 211, at 11–12, 378 S.W.3d 851, 857. Here, Cassandra argues that there were no compelling reasons for TPR and that TPR was not in the children's best interest.

Regarding the "best interest" prong, the TPR statute sets out two factors that must be considered by the circuit court when determining whether TPR is in a child's best interest—likelihood of adoptability and potential harm. *See* Ark. Code Ann. § 9-27-341(b)(3)(A). However, the court is not limited to those factors, and this court has considered additional

8

factors in the best-interest analysis, including (1) preservation of the child's relationship with a grandparent; (2) whether a less drastic measure could be employed, such as a no-contact order or supervised visitation; (3) whether continued contact with the parent would be beneficial to the child when the child was living with a relative or another parent and not in an indeterminate state that is working against the child; and (4) whether the child is living in continued uncertainty. *See Bunch, supra; Cranford, supra.* Each of those cases resulted in a reversal of the circuit court's TPR order and demonstrate that TPR is not always necessary, especially given that the public interest behind TPR is to ensure that children will obtain greater stability and permanence and not languish in foster care indefinitely—a circumstance Cassandra maintains her children did not face. *See Phillips v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 383, at 12, 585 S.W.3d 703, 709–10.

Cassandra submits that there was evidence that MC1 had been in the custody of her maternal grandmother, Jackie Nelson, since her birth, and that MC2 had been in the custody of his paternal step-grandmother, Dana Keaster, since birth and that both would be adopted by those relatives if she is unable to remedy her circumstances. She claims that she was not toxic to the children; she had a bond with MC1—having lived with her until she complied with the circuit court's order to leave the home after this case was opened; she would have had an additional three months to demonstrate her commitment to treatment had DHS not been so quick to pursue TPR three months earlier than is normal in these cases; the children would not suffer any repercussions and their stability would not be threatened if Cassandra

was given the full twelve-month time period; and there was no reason to terminate under these facts and precedent.

We disagree and hold that sufficient evidence supports the circuit court's best-interest finding. A circuit court determines whether TPR is in a child's best interest by considering the likelihood that the child will be adopted and the potential harm to the child if there is continued contact with the parent. *E.g.*, *McNeer v. Ark. Dep't of Hum. Servs.*, 2017 Ark App. 512, at 5, 529 S.W.3d 269, 272. These two factors are not essential elements of proof in a TPR case; thus, neither factor need be established by clear and convincing evidence. *Id.* at 6–7, 529 S.W.3d at 272–73.

Initially, Cassandra argues on appeal that because the children were in the custody of relatives, TPR provided no greater stability and permanence, and the children would not languish in foster care. We hold that she did not preserve this argument for review because the only argument Cassandra made to the circuit court below was that she be given the "full twelve months." *See Cole v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 481, at 11–12, 611 S.W.3d 218, 224–25 (noting that we are precluded from review where the appellant did not make the less restrictive relative-placement argument she later made on appeal to the circuit court at the TPR hearing).

Alternatively, even had Cassandra's argument been preserved, it would still fail. Cassandra incorrectly asserts that both children were in the "custody" of relatives. It is undisputed that MC2 remained in the legal custody of DHS for the entirety of the case. Additionally, although MC2 was temporarily placed with the Keasters, the parents of Jordan

Keaster who was excluded as MC2's father, his exclusion makes them nonrelatives regardless of who had custody. *See M.S. v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 77, at 10, 617 S.W.3d 731, 737 (holding the parents of the putative parent are not relatives as defined by the code). And although MC1 was placed with a relative—her maternal grandmother, Jackie Nelson—and the court orders indicated she was to remain in her custody, there is no order granting Jackie Nelson legal custody in which MC1 could remain. *See Tovias v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 228, at 1, 575 S.W.3d 621, 622 (reversing TPR where there was no evidence to support the finding that Tovias was a legal father).

Moreover, the affidavit states that a "less than custody" petition would be filed, which clarifies that the order likely intended for physical custody of MC1 to remain with Jackie Nelson, not legal custody, leaving MC1's permanency in question. *See Cummings v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 466, at 7, 636 S.W.3d 830, 834 (holding that when a child is in the legal custody of a relative and not temporary foster-care placement with a relative, permanency is not at issue but that the child was living with grandparents in a foster-care placement and thus had not achieved permanency).

Cassandra's argument that she should have been given an additional three months also fails because the record before us supports the circuit court's determination that there is little hope for reunification. *See Moore v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 4, at 7, 682 S.W.3d 706, 711 (holding when a parent demonstrates stability and a reasonable hope for reunification, there is no harm in waiting a little longer before terminating parental

11

rights; but when that stability and reasonable hope for reunification are not present, there is no reason to further delay permanency through TPR and adoption).

Specifically, the evidence supports a finding that Cassandra did not have a sustained bond with either child and visited MC2 only two or three times during the case. She did not comply with the case plan or demonstrate progress toward the initial goal of reunification; specifically, she did not demonstrate stability in housing or employment; she abandoned the children for the majority of the case; and she admitted that she may have to be in drug treatment for life. *See Glover v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 278, at 12–13, 577 S.W.3d 13, 20–21 (distinguishing *Cranford*, *supra*, where the mother had remained unemployed, only recently obtained her own housing paid for by her father and refused to admit potential harm due to drug abuse); *Foster v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 418, at 6–7, 559 S.W.3d 762, 766–767 (distinguishing *Bunch*, *supra*, where there was no evidence that Foster showed progress in complying with the case plan and no evidence that she had a strong bond with the child).

Additional evidence  that Cassandra should not continue contact with the children included testimony from Jackie Nelson, Cassandra's mother, who stated that she did not want Cassandra around MC1 because of her behavior while on drugs. *See Foster*, 2018 Ark. App. 418, at 6, 559 S.W.3d at 767 (distinguishing *Bunch*, *supra*, where there was no evidence that continued contact with the mother would serve the child's best interest in any way). Moreover, evidence in the record demonstrates that Cassandra did not wish to continue any relationship with MC2.

Here, DHS provided evidence that TPR is in the best interest of the children, and the Arkansas Juvenile Code prioritizes adoption with a relative over permanent custody with a relative. *Compare* Ark. Code Ann. § 9-27-338(c)(4) (Repl. 2020) *with* Ark. Code Ann. § 9-27-338(c)(7). There is no requirement in the Juvenile Code that a parent be provided services for twelve months before the circuit court hears a TPR petition. *See* Ark. Code Ann. § 9-27-338(b)(1)(A). Between the prior protective-services case related to MC1 and this case, Cassandra did have more than twelve months to benefit from services, yet she still failed to improve her circumstances. *See Milholland v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 567, at 7–8, 680 S.W.3d 718, 722 (rejecting the mother's argument that she was not given the "statutorily allowed time" where the ground upon which the TPR was granted did not require proof that the child had been out of the parent's custody for twelve months and where there was also no challenge to grounds).

Having reviewed this appeal de novo, we find no clear error in the circuit court's findings regarding the children's best interest. Accordingly, we affirm.

Affirmed.

VIRDEN and MURPHY, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.