SLIP OPINION

 Cite as 2015 Ark. App. 481

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-15-338

| | |
|---|---|
| REBECCA WALLACE<br><br>           APPELLANT<br><br>V.<br><br><br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES AND MINOR<br>CHILDREN<br><br>           APPELLEES | **Opinion Delivered** SEPTEMBER 16, 2015<br><br>APPEAL FROM THE BENTON<br>COUNTY CIRCUIT COURT<br>[NO. J-13-377]<br><br>HONORABLE THOMAS SMITH,<br>JUDGE<br><br>AFFIRMED |

## DAVID M. GLOVER, Judge

Rebecca Wallace's parental rights to her two youngest children, son B.W. (DOB 4/1/03) and daughter R.W. (DOB 1/24/05), were terminated by the Benton County Circuit Court. Wallace now appeals the termination, arguing that termination was not in the children's best interest and that the Department of Human Services (DHS) did not present sufficient evidence to support the termination of her parental rights.[1] We affirm the trial court's decision.

Rebecca Wallace has a long history with DHS, with true findings for allegations stemming back to 2004, including environmental neglect, failure to thrive, medical neglect, and inadequate shelter. The current case began on May 20, 2013, when DHS filed a petition for emergency custody of B.W. and R.W. due to environmental neglect, inadequate shelter,

---

[1]The parental rights of the children's father, Bobby Wallace, Sr., were also terminated, but he is not a party to this appeal.

inadequate food, medical neglect, educational neglect, and substance abuse (by Bobby Wallace, Sr.); an ex parte order of custody was granted the same day. In the probable-cause order, filed May 28, 2013, both Wallaces stipulated to probable cause and that it was in the children's best interest to remain in DHS custody. An adjudication order was filed on June 25, 2013, in which both of them stipulated that the children were dependent-neglected and that it was in their best interest to remain in DHS custody.

A review order was filed on December 17, 2013, finding that the Wallaces were in partial compliance with the case plan, with reunification as the goal. On March 11, 2014, a permanency-planning order was filed that found them in compliance with the case plan, and it was noted that they had made substantial progress; however, the children remained in DHS custody. At the second permanency-planning hearing on June 10, 2014, DHS filed a court report recommending that the children begin a trial home placement; the permanency-planning order, filed on June 13, 2014, reflected that visitation would lead to trial home placement.

The children were placed in a trial home placement on June 13, 2014. However, the trial placement ended on July 3, 2014, due to allegations made by two of Rebecca Wallace's older daughters that Bobby Wallace, Sr. (their stepfather), had sexually abused them. A probable-cause order was filed on July 15, 2014, stating that probable cause has been stipulated by the parties, and reasonable efforts were deemed provided due to the emergency situation requiring the removal.

In a permanency-planning order filed on November 18, 2014, the goal of the case plan

was changed to termination of parental rights. Visitation was not allowed for either of the Wallaces. The trial court noted that Rebecca Wallace denied knowing about the charges of sexual abuse by Bobby Wallace, Sr., prior to July 3, 2014. DHS filed its petition for termination of parental rights on December 1, 2014, alleging three bases for the termination of Rebecca Wallace's parental rights: (1) Arkansas Code Annotated section 9-27-341(b)(3)(B)(vi) (the court has found the juvenile or a sibling dependent-neglected as a result of neglect or abuse that could endanger the life of the child, sexual abuse, or sexual exploitation, any of which was perpetrated by the juvenile's parent or parents or step-parent or step-parents); (2) Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii) (other factors arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that the return of the juvenile to the home is contrary to the juvenile's health, safety, or welfare, and that, despite the offer of appropriate services, the parent had manifested the incapacity or indifference to rehabilitate the circumstances preventing the return of the juvenile to the home); and (3) Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)(*a*)(*3*)(*A*) (the parent is found by a court of competent jurisdiction to have subjected any juvenile to aggravated circumstances). In this case, the trial court found that the aggravated circumstances were that there was little likelihood that services to the family would result in successful reunification. After a hearing, the trial court terminated Rebecca Wallace's parental rights; however, in terminating her parental rights, the trial court did not specify which ground pled in DHS's termination petition that it was relying on.

We review termination-of-parental-rights cases de novo. *Spangler v. Arkansas Dep't*

SLIP OPINION

*of Human Servs.*, 2012 Ark. App. 404. Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents. *Watson v. Arkansas Dep't of Human Servs.*, 2014 Ark. App. 28. An order terminating parental rights must be based upon clear and convincing evidence. *Camarillo-Cox v. Arkansas Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005). Clear and convincing evidence is that degree of proof that will produce in the finder of fact a firm conviction as to the allegation sought to be established; in termination cases, that it is in the children's best interest to terminate parental rights, as well as the existence of at least one statutory ground for termination. *Spangler*, *supra*. When the burden of proof is clear and convincing evidence, the inquiry on appeal is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous; a finding is clearly erroneous when, although there is evidence to support it, the appellate court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Watson*, *supra*. However, we do give a high degree of deference to the trial court, as it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. *Dinkins v. Arkansas Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001).

The testimony at the termination hearing focused in large part on the sexual abuse alleged to have been perpetrated on two of Rebecca Wallace's older daughters by Bobby Wallace, Sr. At the hearing, Emalee Littell, Rebecca Wallace's twenty-three-year-old daughter, testified that her mother married Bobby Wallace, Sr., when she was ten or eleven, and she lived with them until she was fifteen. Littell testified that when she was eleven or

twelve, she was asleep in a recliner in the living room of their home, with her mother asleep on the sofa, when she was awakened in the middle of the night by Bobby Wallace, Sr., touching her breasts under her shirt. Littell said that he did not say anything to her, and that after a few minutes, she jumped up and ran to her room. Littell said that was the only incident between the two of them; Bobby Wallace, Sr., had never talked to her about it; and when she messaged him on Facebook about it, he denied that it had occurred. Littell said that she did not intervene with B.W. and R.W. because she assumed that a parent would not harm his own children. Littell testified that she told her mother about the abuse in June 2014 at a "family meeting"[2] by saying that she hated her mother's husband because he had touched her, and then she left. Littell said that her mother had expressed that she wanted B.W. and R.W. to come home, and that her mother did not want anything to interfere with that. Littell said that she called the police to report her sexual abuse around July Fourth out of guilt because one of Bobby Wallace, Sr.'s girlfriend's children had told B.W. that he did not like Bobby Wallace, Sr., because he was a pervert and something had happened to him. She said even though she did not previously believe that B.W. and R.W. could be in danger, she now thought that they could be at risk even though they were the biological children of Bobby Wallace, Sr. Littell testified that when her mother learned that she had called the police to report the abuse, her mother expressed concern about how that would affect the DHS case. Littell stated that she had never gone into detail with her mother about the sexual abuse until the termination hearing.

---

[2]This was the forum in which the family aired grievances with each other.

H.L., Rebecca Wallace's fifteen-year-old daughter, testified that she was currently in foster care because of the sexual-abuse allegations against Bobby Wallace, Sr. She said that she did not want B.W. and R.W. left with him, due to the fact that he had sexually abused her. H.L. testified that the sexual abuse began when she was seven; it stopped when she was twelve, only because she moved out of the house at that time to live with her sister, Emalee. H.L. stated that one time the abuse started, Bobby Wallace, Sr., would call her into his room, place her on the bed, make her take her clothes off, and take his penis and place it inside of her. H.L. said that one time her little sister came into the room; Bobby Wallace, Sr., yelled at her to get out, told H.L. to get dressed, and told her that she had better not tell anyone, or she would wish that she hadn't. H.L. said that the intercourse would occur at least twice a week, sometimes more, until about a week before her twelfth birthday.[3] H.L. said that she moved out and moved in with her sister because she was tired of what Bobby Wallace, Sr., was doing to her.

H.L. testified that she told her mother about the sexual abuse at the family meeting, and that the discussion took place right before B.W. and R.W. were sent home. H.L. said that one of her other sisters asked her during the meeting if anything had happened, and she began to cry. She said that was when Emalee told her about her own sexual abuse, and that if something had happened, she needed to come forward and say something because B.W. and

---

[3] H.L. clarified during cross-examination by Bobby Wallace Sr.'s counsel that the frequency of the sexual abuse tapered off after she began menstruating at age ten, but he continued to abuse her until she moved out of the house.

R.W. might need her help.  H.L. testified that she told her mother Emalee was not the only person Bobby Wallace, Sr., had done something to, but she did not go into detail.  H.L. said that her mother cried a little bit, but she did not ask any questions.  H.L. said that she attempted to talk to her mother in more detail not long after making her revelation, asking her mother if she even cared, because she did not seem like she wanted to know anything; her mother responded that she did not want that image in her head.  H.L. said that she attempted to tell her mother what had happened in more detail, but that her mother just did not want to know.  H.L. said that she knew B.W. and R.W. had been  left alone with Bobby Wallace, Sr., a couple of times during the trial placement, and her mother did not seem to be bothered by that fact.

On cross-examination, H.L. testified that she first tried to tell her mother about the sexual abuse when she was seven; when she asked her mother if it was okay for someone to do something sexual to you, her mother slapped her and told her to stay out of her Kama Sutra book; so H.L. did not say anything further to her mother because she was scared.  H.L. testified that she thought her mother would piece together what she had told her at the family meeting to understand that Bobby Wallace, Sr., had sexually abused her; that she had not shared any details with her mother because she did not seem as if she care; and that she believed that her mother knew exactly what was happening, but she was just afraid to know the details.  H.L. said that when she received the opportunity to move out of her mother's house at age twelve, she "jumped" on it.

On redirect, H.L. reiterated that her mother would not listen to the details of the

sexual abuse because she did not want that image in her head. She stated that she was "a hundred percent" sure that she had talked to her mother and that her mother was aware something inappropriate had happened to her before B.W. and R.W. returned home on trial placement, and Rebecca Wallace allowed the children to be alone with their father; H.L. believed that her mother just did not care. H.L. asked her mother how she could leave B.W. and R.W. alone with him; her mother told her that she did not have a choice because they were his kids, he had the right to spend time with them, and she was afraid that not allowing him to see the children would reflect poorly on her; she told H.L. that after the DHS case was closed she would do something about what had happened to her.

Detective Brian Hanna of the Rogers Police Department testified that he investigated the sexual-abuse allegations of Emalee Littell and H.L., which resulted in Bobby Wallace, Sr.'s arrest on the charges of rape and sexual assault. Detective Hanna stated that Bobby Wallace, Sr., denied any contact with H.L. and, while he admitted that he had touched Emalee's breast on one occasion, he explained that it was an accident and he thought he was touching Rebecca Wallace.

Shannon Saindon, the caseworker assigned to H.L., B.W., and R.W., testified that B.W. and R.W. were adoptable,[4] and she explained that the potential harm of returning the children to Rebecca Wallace was that she had failed to protect H.L., and she was not confident that she would protect B.W. or R.W. It concerned her that Rebecca Wallace heard of the sexual-abuse allegations yet still allowed Bobby Wallace, Sr., to have contact with

---

[4]Rebecca Wallace does not refute that the children are adoptable.

the children. Saindon said that she was present at the last hearing and heard Rebecca Wallace testify that she "sort of" believed Emalee but did not believe H.L.; Saindon testified that there was nothing she could do to make her believe her daughter, and there was little likelihood of DHS ever being able to reunify if Rebecca Wallace was unable to identify the dangers in her own home and was unwilling to believe there were any dangers. Saindon said that the Department ultimately found that the allegations were true against Bobby Wallace, Sr., for sexual abuse and Rebecca Wallace for failure to protect, based on the investigation from the hotline report.

Rebecca Wallace testified that she was very upset after she heard Emalee testify. She said that when Emalee told her that Bobby Wallace, Sr., had touched her once, it was in June 2014, and B.W. and R.W. were on trial home placement. Rebecca Wallace claimed that she tried to contact Emalee after she made her statement and walked out of the family meeting, but she was never able to talk to her further about the comment; it was her opinion that Emalee did not want to tell her the details. She denied that H.L. ever told her about being sexually abused, stating that she did not recall H.L. asking her at age seven about male parts going into female parts because if she had said something like that, she would have been concerned. She explained that her concern about DHS was that Bobby Wallace, Sr., and his girlfriend were in the bedroom together while the children were at his house; she thought that was inappropriate behavior. She also testified that she did not talk about H.L.'s allegations with her because she had been told not to talk to her about it by Detective Hanna.

Rebecca Wallace denied misleading the trial court into thinking that she and Bobby Wallace, Sr., were living together when it inspected the living conditions at her house prior to trial home placement; she said that they were living in the same house, just not in the same room, and that they had not lived in the same room since 2011, when she learned that he had cheated on her with her sister in 2006. She admitted that she had never told anyone at DHS that, and she did not know if anyone at DHS knew that Bobby Wallace, Sr., was living in the camper behind the house. She claimed that the children were alone with Bobby Wallace, Sr., only one time during the trial placement; however, on cross-examination, she admitted that it might have been two or three times. She stated that after hearing Emalee's and H.L.'s testimony, she felt that she had missed some clues they had given her, and she was worried that they would not ever trust her again.

In terminating Rebecca Wallace's parental rights, the trial court expressed concern that she had lied to the court and that she was going to ignore everything she had to ignore in order to get her children out of DHS custody, which included her older children's statements that Bobby Wallace, Sr., had sexually abused them, and not taking any action to investigate those claims. The trial court stated that she was willing to sacrifice her children's safety in order to get DHS out of her life; found both Emalee and H.L. credible; and stated that it believed the girls had told Rebecca Wallace about the sexual abuse around the time the trial placement began, that she was on notice and chose to ignore the allegations because she was going to do anything she had to do to get the DHS case closed, and that she lied to the court about the status of her relationship with Bobby Wallace, Sr., at the time the trial court began

10

the trial placement.

The bulk of Rebecca Wallace's argument is that DHS did not prove grounds for terminating her parental rights—specifically, she argues that "the ground at issue here is aggravated circumstances, or *i.e.*, whether there was sufficient evidence to demonstrate that Rebecca would not benefit from reunification services to remedy this new and specific issue that the Department and the court deemed to be a failure to protect." DHS pled three different grounds for termination; while the trial court did not specify on which grounds it was terminating parental rights, in its de novo review, this court may hold that grounds for termination were proven, even if not specifically stated in the circuit court's order. *Ratliff v. Arkansas Dep't of Human Servs.*, 104 Ark. App. 355, 292 S.W.3d 870 (2009). Only one of the statutory grounds for termination must be proved by clear and convincing evidence to sustain DHS's burden of proof. Ark. Code Ann. § 9–27–341(b)(3)(B).

We hold that the trial court's decision to terminate Rebecca Wallace's parental rights was not clearly erroneous based on the aggravated–circumstances ground and the trial court's finding that there was little likelihood that services would result in successful reunification. The trial court believed Emalee's and H.L.'s testimony regarding the sexual abuse and the fact that they both told their mother about the abuse at the time B.W. and R.W. were put in their trial home placement. It further believed that Rebecca Wallace chose to ignore that information and continued to allow Bobby Wallace, Sr., access to B.W. and R.W. after she learned of the abuse because she did not want anything to derail the closure of the DHS case, stating that she would deal with those allegations after the DHS case was closed. Such

credibility determinations are for the fact-finder to make. The trial court was also particularly troubled by the fact that she misled it into believing that she and Bobby Wallace, Sr., were living together and working on the case plan shortly before the trial home placement, when in fact they were either living in separate rooms in the house or Bobby Wallace, Sr., was living in a trailer in the back yard, and both parties had significant others in their lives. Given those circumstances, the trial court simply did not believe that there were any services that could be offered that could provide successful reunification.

Rebecca Wallace also argues that the evidence does not demonstrate that the children would be subject to potential harm if returned to her custody. In determining the best interest of the juveniles, a trial court must take into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. *Myers v. Arkansas Dep't of Human Servs.*, 2011 Ark. 182, 380 S.W.3d 906. In considering potential harm caused by returning the child to the parent, the trial court is not required to find that actual harm would result or affirmatively identify a potential harm. *Welch v. Arkansas Dep't of Human Servs.*, 2010 Ark. App. 798, 378 S.W.3d 290. Potential harm must be viewed in a forward-looking manner and in broad terms, including the harm the child suffers from the lack of stability of a permanent home. *Collins v. Arkansas Dep't of Human Servs.*, 2013 Ark. App. 90.

Clearly, the trial court did not believe that Rebecca Wallace was capable of protecting her children from harm given the testimony presented at the termination hearing regarding

her willingness to sacrifice her children's safety in order to get DHS out of her life. She demonstrated that she was unable or unwilling to protect her children from sexual abuse, even when informed about the abuse.

Affirmed.

VIRDEN and VAUGHT, JJ., agree.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant.

*Mischa K. Martin*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.