Cite as 2024 Ark. App. 78

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV-23-490

| | |
|---|---|
| SUMMER KAZZEE<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | Opinion Delivered February 7, 2024<br><br>APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. 26JV-21-370]<br><br>HONORABLE LYNN WILLIAMS, JUDGE<br><br>AFFIRMED |

**BART F. VIRDEN, Judge**

The Garland County Circuit Court terminated appellant Summer Kazzee's parental rights to her minor child (MC), a son. Kazzee argues that the trial court erred in changing the case goal at the permanency-planning stage from reunification to termination of parental rights and adoption. Kazzee further contends that the trial court erred in finding sufficient evidence to support the failure-to-remedy ground for termination and in finding that termination was in MC's best interest. We affirm both orders.

I. *Background*

On December 17, 2021, the Arkansas Department of Human Services (DHS) filed a petition for dependency-neglect and a motion to withhold reunification services. The petition alleged that DHS had taken emergency custody of MC, born December 14, because

of Kazzee's extensive history with DHS and her abuse, neglect, and unfitness with respect to her newborn baby. In the affidavit attached to the petition, the social worker attested that Kazzee had been inattentive to, and disengaged from, MC, who cried while lying in his bassinet next to her hospital bed. In adjudicating MC dependent-neglected, the trial court found the following:

> The Court finds that the juvenile is dependent-neglected and that the allegations in the petition are true and correct, specifically, the Court finds the juvenile was at substantial risk of serious harm as a result of the mother's history of neglect and parental unfitness to the juvenile or a sibling. Additionally, the juvenile was subjected to aggravated circumstances, specifically: siblings were neglected and abused such that the abuse and neglect endangered the life of one sibling and took the life of another; the parent has committed a felony battery that resulted in serious bodily injury to any child; the parent has had parental rights involuntarily terminated as to a sibling of the child. In case 26CR-16-507, Ms. Kazzee was charged and found guilty by [a] jury of a class D felony for the near starvation of [MC1] as he was found to have gained no weight since his birth several months earlier; he was severely dehydrated, cachectic, suffering from temporal wasting, and near death. In case 26JV-16-299, that child was removed to foster care; Ms. Kazzee did not complete services to have the child returned; her parental rights to [MC1] were involuntarily terminated; that child was later adopted. In case 26CR-19-851, Summer Kazzee was charged and pled guilty to the negligent homicide of [MC2] after Ms. Kazzee left the child unattended for many hours in a car seat, who was strangled by the seat's straps. In case 26JV-19-206, her surviving child [i.e., MC3], the twin of [MC2], was removed to foster care; Ms. Kazzee again did not complete services to have the child returned; [MC3] was placed in the custody of his father and the case was closed.

Following adjudication, the trial court set a goal of reunification and ordered DHS to provide Kazzee with services. The case was reviewed in May and September 2022, and the trial court continued the goal of reunification but established a concurrent goal of relative or fictive-kin placement. At a permanency-planning hearing held in December, the trial court found that Kazzee was partially compliant with the case plan and court orders but still had

concerns about her ability to parent MC. The trial court changed the goal from reunification to termination of parental rights and adoption.

In March 2023, DHS filed a petition to terminate Kazzee's parental rights based on three grounds pursuant to Ark. Code Ann. § 9-27-341(b)(3)(B) (Supp. 2023): (i)*(a)* (twelve-month failure to remedy); (vi)*(a)* (the court has found the juvenile or a sibling dependent-neglected as a result of neglect or abuse that could endanger the life of the child, which was perpetrated by the juvenile's parent); and (ix)*(a)(4)* (involuntary termination as to a sibling). Following a hearing, the trial court specifically found that the evidence had proved the failure-to-remedy ground as alleged in DHS's petition. The trial court also found that termination was in MC's best interest, considering both his adoptability and the potential harm in returning him to Kazzee's custody.

II. *Discussion*

A. Goal Change at Permanency-Planning Stage

As a preliminary matter, DHS argues that Kazzee's appeal of the permanency-planning order is untimely. In order to challenge findings made in the permanency-planning order, the order must be designated in the notice of appeal, and the record must include the transcript of the hearing. *Coulter v. Minor Child*, 2021 Ark. App. 398, 636 S.W.3d 377. Here, Kazzee designated the permanency-planning order in her amended notice of appeal and provided the hearing transcript in a supplemental record. We conclude that Kazzee's appeal of the permanency-planning order is properly before us.

The permanency-planning statute requires the court to select a goal based on the best interest, health, and safety of the juvenile. Ark. Code Ann. § 9-27-338(c)(3) (Repl. 2020). The trial court may authorize a plan to place custody of the juvenile with a parent; however, the parent must be complying with the established case plan and court orders, making significant and measurable progress toward achieving the goals established in the case plan, and diligently working toward reunification or placement in the parent's home. Ark. Code Ann. § 9-27-338(c)(3)(A)(i). The burden is on the parent to demonstrate a genuine, sustainable investment in completing the requirements of the case plan and following the court orders to retain reunification as the permanency goal. Ark. Code Ann. § 9-27-338(c)(3)(A)(iii). A petition to terminate parental rights is not contingent on the outcome of a permanency-planning hearing. Ark. Code Ann. § 9-27-338(b)(1)(A); *Bean v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 77, 513 S.W.3d 859.

At the permanency-planning hearing in December 2022, the trial court heard testimony from Dr. George DeRoeck, who had performed a psychological evaluation of Kazzee in May. He noted that Kazzee was functioning within the borderline range of intellectual development. He diagnosed specified anxiety disorder. He testified that she would require "a good deal" of support and assistance with parenting and that close monitoring of her willingness to work with DHS would be required. Dr. DeRoeck stated, however, that Kazzee's "overall capacity to independently parent is marginal." Ashlee Fason, a licensed social worker at Ouachita Behavioral Health and Wellness, testified that she had

been counseling Kazzee for several months and that Kazzee had made progress "through self-reporting" and was learning coping strategies for her anxiety and depression.

Tashauna Hammock, a DHS caseworker, testified that, although Kazzee had parenting classes through Changepoint, she was still not able to implement those skills. She said that Kazzee's compliance with the services was not the issue—it was her ability to apply what she had learned. Hammock further testified that she had visited Kazzee's home in the past month and noted that there were no baby items for MC. She stated that Kazzee's visits with MC could not be at her home because of the home's unsafe condition. Hammock further testified that Kazzee is not employed, sleeps most of the day, and relies on her boyfriend for support. She also said that Kazzee had told her that she is not willing to be on medication for her depression or anxiety. Hammock explained that

> [t]he reason for the goal change, altogether in the last 72 months Ms. Kazzee has had a case with the Department for 52 of those months. She has been through intensive parenting classes, therapy, she's done psych evals, and she's been reported as unmotivated. Her depression, her anxiety is still a barrier. There are concerns about her being able to parent independently, and home visits, there's dog feces on the floor, puppy pads, dried urine. It's cluttered with clothes stacked up. Ms. Kazzee sprained her wrist from the clutter. She tripped over the clutter in her home. Given the extensive history of her mental health, that's the reason we're recommending a goal change.

Kazzee testified that she lives with her boyfriend, Christopher Ulmer, in a two-bedroom apartment. She testified that her past troubles were due to being with an abusive, controlling man but that she had learned from all of her traumatic experiences and knew that she could do better. Kazzee requested more time with MC and said of the court and of DHS, "[I]f they tell me to jump off a cliff, I will do it."

At the conclusion of the hearing, the trial court told Kazzee that it knew her history "from day one," referring to her prior cases with her other children. The trial court noted that she had been offered services in the past but that the services did not "seem to have any impact." The trial court said that it could not safely place MC back in the home with her. Although the trial court changed the goal of the case to termination of parental rights and adoption, it ordered DHS to arrange for intensive parenting classes and told Kazzee to continue with the reunification services until the termination hearing, which it "pushed" from early March to mid-April 2023 to give Kazzee plenty of time to benefit from services.

On appeal from the permanency-planning order, Kazzee argues that she was complying with the case plan and court orders, making significant progress, and working diligently toward reunification with MC. Kazzee asserts that "[a]s to the deficiencies that were still identifiable, such as the clutter and the puppy messes, . . . those were curable within a three-month period." Kazzee also argues that the trial court erred in changing the goal without making "a required finding in the order one way or another on her progress."

The burden of proof in a permanency-planning hearing is preponderance of the evidence. *Yelvington v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 337, 580 S.W.3d 874. The standard of review on appeal is de novo, and we will reverse only if the trial court's findings are clearly erroneous. *Id.* It is well settled that credibility determinations are left to the trial court. *Id.*

In its order, the trial court found that Kazzee had been partially compliant with the case plan and court orders. In terms of her progress, the trial court noted from both the

6

bench and in its order that Kazzee had completed some services but that she had not secured employment, had not maintained a clean home, and had experienced difficulty with implementing the parenting skills from the classes that she attended. Although Kazzee asserts that she could have alleviated "the clutter and the puppy messes" within a three-month period, she had not done so in the twelve months leading up to the permanency-planning hearing. Also, Kazzee had not progressed to the point that she could have unsupervised visits with MC. We cannot say that the trial court clearly erred in concluding that Kazzee failed to prove that she had made a genuine, sustainable investment in completing the case plan to keep reunification as the goal.

## B. Termination of Parental Rights

The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). In order to terminate parental rights, a trial court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing by clear and convincing evidence as to one or more of the grounds for

7

termination listed in section 9-27-341(b)(3)(B); however, only one ground must be proved to support termination. *Wheeler v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 453, 607 S.W.3d 536.

At the termination hearing in April 2023, Hammock testified that Kazzee's home had not been appropriate for the monthly home visits until the week before the termination hearing. According to Hammock, Kazzee was still unwilling to crate her dog. Also, she testified that Kazzee had not been employed throughout the case. She described Kazzee's progress as "minimal" and said that she had not progressed to unsupervised visits with MC.

Sherry Burke, a supervisor with SafeCare's "intensive" parenting classes, testified that she had been working with Kazzee since January and that Kazzee had completed only five of the eighteen sessions in the program. The sessions last one to one and a half hours. She said that the entire eighteen sessions should take between eighteen and twenty-two weeks. Burke said, however, that she had been "splitting," and even repeating, the sessions because Kazzee needed more practice, i.e., she was not grasping concepts. Burke said that the classes focused on playing, diapering, and feeding. Burke was asked whether she was confident that Kazzee could be left alone for eight hours to care for MC without intervention, and she said that she thought Kazzee could change MC's diaper and then pivoted and said that Kazzee had made "a lot of improvement." She also stated,

> I think [Kazzee's] attention span is kind of—there are times when she's having difficulty to engage or I have to repeat myself. Ask the same questions multiple times, four, five, six times. Ask her the same question before she'll respond. Part of the reason why our sessions are being split in half is it takes a really long time to do a task that shouldn't take—take that long. So—and I do feel that it's hard for her to multitask,

8

to carry a conversation with me and do the activities that we were doing and also care for her child at the same time.

Jamie Moran, a DHS supervisor who had also been involved with Kazzee's prior cases concerning her other children, testified that MC "is her fourth child and we're still struggling with just basic, basic essential needs to take care of a baby." Moran said that she had observed Kazzee's sessions and that Kazzee had a difficult time putting a diaper on MC and making a bottle to feed him. She said that Kazzee is still unemployed. She stated that Ulmer, who has a job, had not been involved with DHS at all and that, if he leaves Kazzee, she will have no home and no means of support. She did not think that MC would be safe if he were to be sent home that day to live with Kazzee. Moran said that Kazzee's IQ is low *average* but that DHS had made several accommodations for her.

Ulmer testified that he works full time and pays for everything. He insisted that Kazzee had worked for a while at an alligator farm but had to see a chiropractor for her back. He said that Kazzee also earns money dog sitting. He said that their puppy defecates on the floor only when they are gone for a long time or asleep and that the mess gets cleaned up immediately. Ulmer acknowledged that he had seen MC "very few times."

Kazzee testified that she had not yet been paid for the dog sitting she began two days before the hearing. Kazzee stated that she does not take her own dog outside to walk or to urinate because she does not feel safe walking alone. She testified that she is dog sitting temporarily until she gets back on her disability check. Kazzee was asked what she can lift in light of her back injury, and she said, "Not hardly anything really." She clarified, however,

9

that she can lift MC. In describing her daily routine, Kazzee said that she gets up early in the morning and cleans the house. When asked what she had learned at SafeCare, she said, "I'm getting better at changing [MC's] diapers. Getting better at feeding him." Kazzee requested more time to work the services and to complete her SafeCare classes.

In its order terminating parental rights, the trial court found that Kazzee had not remedied the conditions that had caused MC's removal from her custody. The trial court found that Kazzee had made "very little progress in her ability to independently parent" MC and that there was the potential for harm in returning him to her custody. The trial court found that Kazzee still needed assistance in providing for MC's basic needs. The trial court said that there was no other service that Kazzee could receive that she had not already received or been offered.

We review termination-of-parental-rights cases de novo but will not reverse the trial court's ruling unless its findings are clearly erroneous. *Best v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 485, 611 S.W.3d 690. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. *Id.*

1. *Grounds*

Kazzee argues that she was making progress but had progressed slowly because of her low IQ. She argues that DHS relied solely on her history to terminate her rights to MC. She

says, "Unfortunately, there was not a finding on a ground related to a past case, nor to aggravated circumstances, only on [failure to remedy]." In anticipation of DHS's argument that the trial court mentioned aggravated circumstances and little likelihood of reunification, Kazzee argues that they were only facts to support "the above-listed ground," i.e., failure to remedy, and not a separate ground to support termination.[1]

It is true that the trial court identified only the failure-to-remedy ground in terminating Kazzee's parental rights; however, in our de novo review, we may address the other grounds alleged in DHS's petition. The de novo standard opens the entire record for our review. *Brumley v. Ark. Dep't of Human Servs.*, 2015 Ark. 356. This court may hold that grounds for termination were proved, even if not specifically stated in the trial court's order. *Wallace v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 481, 470 S.W.3d 286. We may affirm the trial court's termination if the ground was alleged in the termination petition and the ground was proved at the termination hearing. *Chassels v. Ark. Dep't of Human Servs.*, 2022 Ark. App. 503.

DHS alleged in its petition grounds related to the abuse and neglect that MC's siblings had suffered and to the involuntary termination of Kazzee's parental rights as to

---

[1]We note that the trial court found that Kazzee had subjected MC to aggravated circumstances in the adjudication order, which is an appealable order in a dependency-neglect proceeding. Ark. Sup. Ct. R. 6-9(a)(1)(A). When a party fails to appeal from an adjudication order and challenge the findings therein, she is precluded from asserting error with respect to those findings on appeal from an order terminating parental rights. *Brown v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 303, 521 S.W.3d 183. Here, Kazzee did not appeal from the adjudication order finding that she had abused and neglected MC's siblings.

MC1. There was testimony and a court report concerning these two grounds introduced at the hearing. Kazzee cannot dispute those two grounds related to MC's siblings—they are established. Even assuming, however, that failure to remedy was the only ground proved, MC was removed from Kazzee's custody at birth because of her general inability to care for him as an infant. While Kazzee may have been doing the best she could do, considering her low-average IQ, the trial court could not safely place MC in Kazzee's custody when she continued to struggle with providing the most basic care for MC. Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Cobb v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 85, 512 S.W.3d 694. Also, Kazzee had not secured a job and had not cleaned her home until days before the termination hearing. *Jones v. Ark. Dep't of Human Servs.*, 2023 Ark. App. 559. ___ S.W.3d ___ (holding that the trial court was not required to credit the father's eleventh-hour effort to show that he could provide his child with stable housing).

Although Kazzee submits that her parental rights to MC were terminated solely due to her history involving MC's siblings, we note that the trial court ordered DHS to provide reunification services for well over a year and even ordered more intensive parenting-skills classes for her after changing the goal to termination and adoption. According to Burke and Moran, Kazzee was simply not grasping the concepts that were being taught at the parenting classes. *See Meriweather v. Ark. Dep't of Human Servs.*, 98 Ark. App. 328, 255 S.W.3d 505 (2007) (recognizing that a termination order may be affirmed even when the mother attempted to be the parent that her child needed but was not able to be that parent, at least

12

not without a steady support system provided by DHS). A child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. *Watts v. Ark. Dep't of Human Servs.*, 2023 Ark. App. 334, 669 S.W.3d 915. Because there was evidence to support at least one ground for termination, *see Wheeler*, *supra*, we cannot say that the trial court clearly erred in terminating Kazzee's parental rights to MC.

## 2. *Potential Harm*

Kazzee specifically challenges the trial court's finding of potential harm. She argues that the trial court merely parroted the statutory language in its best-interest analysis and that the term "potential harm" does not appear in the transcript of the termination hearing. Kazzee acknowledges that her history with DHS is "no insignificant factor" but argues that she was making progress, yet her rights were nonetheless terminated.

The trial court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Rickman v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 261, 548 S.W.3d 861. The potential-harm evidence must be viewed in a forward-looking manner and considered in broad terms. *Id.* Finally, a parent's past behavior is often a good indicator of future behavior and may be viewed as a predictor of likely potential harm should the child be returned to the parent's care and custody. *Id.*

Regardless of the words used, Hammock testified that Kazzee's history represents a safety concern when considering sending MC home with her, and Moran testified that she did not think that MC would be safe in Kazzee's care. Moreover, the same facts supporting any one of the three grounds for termination demonstrate the risk of harm that could result

13

from returning MC to Kazzee's custody. *See Davis v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 275. We hold that the trial court did not clearly err in finding that termination of Kazzee's parental rights was in MC's best interest.

Affirmed.

GLADWIN and WOOD, JJ., agree.

*Eden Law Firm*, by: *Kimberly Eden*, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.